UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHAILA BERNARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:24-cv-2944 |
| | § | |
| RTX CORPORATION, f/k/a RAYTHEON TECHNOLOGIES CORPORATION | § § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

Shaila Bernard complains of Defendant RTX Corporation, and for cause of action states:

**Parties**

1. Plaintiff Shaila Bernard ("Bernard" or "Plaintiff") is a resident of Denton County, Texas.

2. Defendant RTX Corporation (referred to herein as "Raytheon") is a Delaware corporation that was formerly known as Raytheon Technologies Corporation. Its principal place of business is in Arlington, Virginia. Defendant may be served with process by serving its registered agent for service of process in Texas, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

**Jurisdiction and Venue**

3. This court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331.

1

4. This Court has personal jurisdiction over Defendant because it does a substantial amount of business in Texas, and it has sufficient minimum contacts with the State of Texas to allow this Court to exercise personal jurisdiction over the Defendant in this case.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Venue is also proper in this Court under 42 U.S.C. § 2000e-5(f)(3) (incorporated into the ADA by 42 U.S.C. § 12117(a)) because the unlawful employment practices alleged herein occurred in the State of Texas, and because Bernard would have continued to work in Dallas County (and other counties which comprise the Dallas Division) if not for the unlawful employment practices complained of herein.

**Exhaustion of Administrative Remedies**

6. Plaintiff exhausted her administrative remedies and has complied with all procedural prerequisites to filing this lawsuit. On February 14, 2023, Plaintiff dual filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Civil Rights Division. A true and correct copy of this Charge is attached to this Complaint as Exhibit A. On February 19, 2024, Plaintiff filed an amended Charge of Discrimination. A true and correct copy of this Amended Charge is attached to this Complaint as Exhibit B. On August 27, 2024, more than 180 days after the amended charge was filed, the EEOC issued a Dismissal of Charge giving Plaintiff the right to file a lawsuit. A true and correct copy of this Dismissal of Charge is attached to this Complaint as Exhibit C.

**Relevant Facts**

**Plaintiff's Disabilities and Qualifications**

7. Bernard was born with Cerebral Palsy. For her entire life, she has had left-side hemiparesis, which substantially limits her ability to move the left side of her body. She walks with a limp, and she is unable to use her left hand, so she types with only her right hand. Her disability is apparent to anyone who sees her. Her physical impairments substantially limit one or more major life activities, including walking, standing, lifting, caring for herself, and performing manual tasks.

8. Bernard has a bachelor's degree in computer science, and she began working as a software engineer in 1995. By 2021, she had 26 years of experience as a software engineer working for defense contractors and tech companies, including an earlier period of employment for sixteen years at another Raytheon company, Raytheon Missiles Division (1995 – 2011).

**Plaintiff's Job at Raytheon**

9. During the last half of 2021, Bernard applied for an open position as a Senior Software Configuration Manager at Raytheon Intelligence and Space, which was a business unit of Raytheon Technologies Corporation ("Raytheon"). The position required the applicant to have the ability to obtain a Department of Defense (DoD) security clearance. Bernard already had this clearance for the job she was working in at the time.

10. Bernard later had two job interviews with Rachael Biederman and Benny Ray Johnson. During these interviews, Bernard said she could not work with hardware, and the interviewers confirmed that the position she was being considered for was strictly software and did not require working with hardware.

3

11. By letter dated December 13, 2021, Raytheon offered Bernard a job as Principal Engineer, Software Engineering, reporting to Rachael Biederman, and Bernard accepted the offer. For some reason, Raytheon later sent another offer letter dated January 11, 2022 offering Bernard a job as Principal Software Engineer, reporting to Rachael Biederman.

12. The job (or jobs) Raytheon offered was a higher-paying job than the one Bernard applied for, and it was more in line with Bernard's qualifications.

13. Bernard accepted Raytheon's offer, and her first day on the job was March 7, 2022. Bernard was told she would be working on the Palinode program, which involved work on the software used by the U.S. Air Force for certain weapons and communications systems. However, pending a third-party government contractor's investigation and approval of her security clearance to work on this project, she was unable to work on some aspects of the project.

14. During her first three weeks, Bernard worked on site at Raytheon's Richardson location. During this time, Bernard met with and worked with several Raytheon employees, Rachael Biederman, Benny Ray Johnson, Liz Ottwell, and Darrell Simon. Each of these Raytheon employees saw that that Bernard had a substantially-limiting physical impairment. Bernard and Ottwell also had a face-to-face discussion in which Bernard told Ottwell she had Cerebral Palsy and had been treated successfully for seizures. From these encounters and discussions, Raytheon knew of Bernard's disabilities as early as March 2022.

15. After the first three weeks of onboarding, Bernard worked mostly from home. She was told she was classified as "awaiting assignment" pending approval of her security clearance to work on tasks that required the clearance.

16. Raytheon began to assign discreet tasks on some non-classified aspects of the Palinode program, but Raytheon never provided Bernard with an overall understanding of her

job and her duties.  After several weeks of asking what her duties were, Darrell Simon (a mentor and coworker in software) began to educate her on the Palinode program, and Bernard was told to also take online leadership and training classes, which she did.  At all times during her employment, Bernard performed the tasks she was assigned, and no supervisor or manager ever told her that she was failing to meet expectations.

**Defendant's Discrimination Because of Disabilities**

17. After becoming aware of Bernard's disability in the summer of 2022, Katie Rohler (Project Owner over the Palinode program) began to treat Bernard differently because of her disability.  It started during a Zoom meeting between Rohler and Bernard in which Bernard shared her computer screen with Rohler, and Rohler could see what Bernard was typing.  Rohler expressed frustration and said something like, can't you type any faster?

18. Rohler treated Bernard differently after she learned of Bernard's disability. Rohler began subjecting Bernard to increased scrutiny, and she sent requests wanting to watch and monitor Bernard as she worked.  There was never a problem with Bernard's work product or timeliness, but Rohler began sending instant messages and chats, and more requests to cease what Bernard was doing to jump on a Zoom meeting with Rohler.

19. Rohler showed an increased level of interest in Bernard's work, and she began to question Bernard's ability to do her job, which Bernard found to be demeaning.  Rohler also began talking to and emailing Rachel Biederman, Benny Ray Johnson, and Darrell Simon questioning Bernard's abilities.  In turn, Biederman questioned Bernard, asking if she had the qualifications she listed when she applied for the job.  Bernard grew frustrated by Rohler's conduct and Biederman's questions, because Bernard just wanted to do her job in peace and not be treated differently because of her disabilities.

5

20. Bernard complained to Biederman and to Liz Ottwell about Rohler's conduct, but nothing improved. Typing speed was not an essential function of the position, and but for her physical disabilities, Bernard would not have been subjected to Rohler's needless intrusions and demeaning questions about her qualifications and abilities.

21. Bernard also discussed her complaints with Sarah Campo in HR, but Campo did not act on Bernard's complaints.

22. Later that summer, in August 2022, Bernard began to experience extreme pain in her jaw and in both ears, which she believed to be side effects caused by a COVID-19 booster vaccine. She became unable to work, and she tried to reach Biederman and Rohler by phone to let them know she would be away from work, but she was unable to reach them. Bernard then spoke to someone in HR who told Bernard to take PTO (paid time off) as needed. Bernard emailed Rohler to let her know she was taking PTO.

23. When Bernard was able to resume working, Biederman gave Bernard a verbal warning not to take time off, even if it was medically necessary. Biederman also said she was going to put a written warning in Bernard's file.

**Plaintiff's Reassignment to a Hardware Position**

24. Thereafter, probably in October 2022 or very early November 2022, Bernard had a Zoom meeting with Biederman, Ottwell, and Campo. Biederman told Bernard that Raytheon no longer had any software work to do on the Palinode program, so Bernard was being reassigned to a hardware position reporting to Liz Ottwell where she would have to work hands on with equipment, 100% on site at Raytheon's Richardson location.

25. Bernard told Biederman and Campo that she was physically unable to work with hardware unless Raytheon provided her with medical accommodations. At the end of the call,

Bernard was not clear on how her request for accommodations would be handled, so she sent an email to Biederman and Campo stating she would need accommodations if she was going to be reassigned to a hardware position.

**Plaintiff's Request for Reasonable Accommodations for the Hardware Position**

26.     On November 2, 2022, a Raytheon accommodations nurse (Michael Dolliver) sent an email to Bernard stating that Raytheon had received her request for reasonable accommodations, and he attached a medical certification form to his email and said it needed to be filled out by a doctor and returned within thirty days.  On page three of the form, it said: "Refer to Essential Functions Worksheet when answering these questions."  After that, there were three questions, including: "What essential job function(s) listed in the Worksheet is the employee having trouble performing because of the limitation(s)?"  However, Raytheon did not provide an Essential Functions Worksheet, or anything else listing the essential job functions of the hardware job she was being reassigned to.  Based on the information provided there was no way a doctor could determine what accommodations were needed, if any.

27.     Bernard nevertheless tried to comply with Dolliver's instructions, and she scheduled an appointment with her primary care doctor, Samiska Shah, to discuss accommodations.  The earliest available appointment was on December 15, 2022, so Bernard let Dolliver know she would not be able to respond within the 30-day period allowed by Raytheon.

28.     Meanwhile, Raytheon prevented Bernard from working because she was not assigned or told to perform any tasks.  Bernard tried to get a job description for her newly-assigned hardware position, so her doctor would know what the essential functions of the position were and be able to complete the certification form, but nothing was provided for

7

several weeks.  The uncertainty and lack of communication from Raytheon was distressing and anxiety inducing.

29.	On December 7, 2022, Dolliver sent Bernard an email stating: "I was able to gather this job description for your upcoming appointment with your provider so that they can review and complete your ADA form."  He attached a document to his email, but it was not a job description.  It was an Excel spreadsheet named "FJR.xlsx," and it looked nothing like the requisition Bernard saw when she applied for a job at Raytheon.

30.	At the top of the spreadsheet it said "Functional Job Requirements," and there was a narrative describing the essential functions for Principal Software Engineer.  This was the job title of the position Raytheon told Bernard she no longer had; it was not a description of the hardware job Biederman told her she was being assigned to.  Also, unlike the requisition, this spreadsheet mentioned Shaila by name (*e.g.* "Shaila's job is primarily a desk position …"), whereas the requisition was generic ("The candidate will provide …").  The FJR document also stated that this was a 100% on-site position, which would be a major change because Bernard worked mostly from home in her prior position.

31.	Dolliver's December 7, 2022 email copied several people as cc's, and later that day Bernard replied to all asking Dolliver what position the FJR document was for.  One of the people copied on the email was Natalie Waite, a Human Resources Manager.  Waite replied to Bernard on December 8, 2022, stating: "The Job Description that was sent to you, was created by your manager, based on the current activities you perform today. This should be sufficient for what your physician is looking for, in order to properly understand what accommodations may be required for your current health condition."  Bernard was still confused because she was not

8

currently performing any duties, and Waite's reply did not clarify the duties of the hardware position.

**Raytheon's Failure to Engage in the Interactive Process**

32. Bernard therefore sent an email to several Raytheon managers and HR employees asking for the job description for her new position, and stating the one that had been provided was inadequate. Her email also said: "Liz Ottwell and Rachael Biederman have stated they are moving me out of software so I need to understand how this job is different. Both these ladies stated they were moving me out of software. So given that I have 27 years in software where are they putting me? In hardware? Electrical? Testing? Please provide me a job title and skills listed with a current job requisition." Raytheon never answered this basic question.

33. Sarah Campo in HR responded to Bernard on December 9, 2022, stating that Raytheon did not have job descriptions. Campo did not answer Bernard's question asking what position she was being assigned to, she simply said that Bernard's doctor should use the FJR document to determine what accommodations would be needed in her new role. This still did not make sense, because the FJR document described a software position that was primarily a desk job, and Bernard had been told she was being assigned a hardware job. Furthermore, Bernard did not need (and had not asked for) accommodations for a software job; she had only asked for accommodations to perform the essential functions of the hardware position. If she was being transferred to a different software position, she could have been working continuously without accommodations. Raytheon was keeping her from working by refusing to clarify what her new job assignment was.

34. By this time, Bernard had retained counsel, who sent a letter to Raytheon on December 9, 2022 alleging disabilities discrimination based on Raytheon's actions to date, and

9

noting how Raytheon was failing to engage in the interactive process by refusing to clarify what new position Bernard was being moved into. A true and correct copy of this letter is attached to this Complaint as Exhibit D. To Bernard's knowledge, Raytheon never responded to this letter and it never clarified whether the new position was hardware, software, or something else.

35. On December 15, 2022, Bernard met with her primary care doctor to go over Raytheon's medical certification form. Dr. Shah told Bernard she was unable to describe the accommodations needed without knowing what the essential job functions were, so she declined to fill out the medical certification form.

36. Bernard was ready and willing to work, and she never refused the reassignment, but Raytheon never told Bernard what her new hardware job would be. Raytheon never told her what the essential functions of the new hardware job were, and Raytheon never engaged in the interactive process required by the ADA concerning accommodations needed for the hardware job. Instead, Raytheon took the position that Bernard was refusing to work, so the company stopped paying her.

37. On February 15, 2023, Bernard let Campo know that she had an appointment scheduled with her doctor in March, and she asked again for the requisition for the position she was being moved to. Campo replied stating (for the first time) "We do not have a requisition for the role you were moved to." Two days later, Campo added that "requisitions are used when a role is competed" [sic], and she reiterated the instruction telling Bernard to have her doctor use the FJR to determine what accommodations may be required.

38. If Raytheon creates requisitions when roles are "completed," then it should have had a requisition for Bernard's new position. Raytheon told Bernard that she had been moved into this new position, so the position had been created, completed, and staffed. Campo's

statement therefore made no sense, and her repetition of the instruction to use the FJR did not advance resolution of the issue.

39. On February 27, 2023, Campo emailed Bernard asking if she had everything she needed for her March doctor's appointment. Bernard replied that she did not, she still needed the job description for her current position. Campo replied with the same non-response (no clarification whether the position was software, hardware, electrical, testing, or something else) telling her just use the FJR document. Bernard explained again that the FJR form did not provide information about the job duties she would be performing, so her doctors were unable and unwilling to complete the medical certification Raytheon wanted.

40. Bernard went to an appointment in March with Dr. Kellam, her neurologist. He said he was unable to complete the medical certification without knowing more about the tasks they wanted her to perform. Bernard emailed Raytheon letting them know, and still Raytheon did not clarify what her job was.

**Plaintiff's Position Elimination and Termination**

41. On June 21, 2023, Bernard had a Zoom meeting with Rachel Biederman, who explained that Bernard's position had been eliminated due to corporate restructuring. Bernard was told that she could apply to other open positions.

42. During July and August 2023, Bernard and Campo exchanged emails about the potential for Bernard to move into an open position, and Bernard applied for and interviewed for open positions. Bernard was not hired to fill any of the jobs she applied for.

43. On September 12, 2023, Raytheon sent Bernard an email telling her she was being laid off as of September 26, 2023. Raytheon also sent her a layoff package telling her she had been eliminated as part of a reduction in force. The layoff package said the group

considered for payoff (the decisional unit) consisted of three employees whose job titles were all listed as "Prin Eng, Software Engrg." Only one of the three employees, Bernard, was selected for layoff.

44. The package said the decision on who to layoff was based on three criteria, but two of the three were not applicable because of the facts. The second criterion was: "one or more of the employees in the decisional unit volunteered to be laid off and the Company accepted them as a volunteer, if applicable," but according to the layoff package, no one volunteered. The third criterion was "all of the positions in the decisional unit were eliminated," but the other two employees were not selected for layoff and remained employed in their positions.

45. This leaves only the first criterion as the basis for the decision. It was: "a relative ranking of each employee within the decisional unit using the following four criteria: "current performance, job knowledge, flexibility/initiative, and length of service." However, Bernard had no current position – she was told in June 2023 that the job she had been placed in during the last quarter of 2022 no longer existed. Therefore, except for length of service, none of the factors listed could have been used to compare Bernard to the other two employees considered for layoff.

46. The reduction in force was a false and pretextual excuse for terminating Plaintiff's employment.

47. Raytheon discriminated against Bernard because of her disability, and then retaliated against her because she requested accommodations and opposed Raytheon's discriminatory conduct.

**Plaintiff Meets All Requirements to Assert Her Claims**

48. At all times relevant to this case, Bernard was an "employee" of Defendant as the term "employee" is defined in Title I of the ADA.

49. At all times relevant to this case, Raytheon was Bernard's "employer" as the term "employer" is defined in Title I of the ADA.

50. At all times relevant to this case, Raytheon employed more than 500 employees.

### First Cause of Action
### Disabilities Discrimination – Failure to Accommodate

51. At all times relevant to this case, Bernard was a qualified individual with one or more disabilities.

52. Raytheon discriminated against Bernard in violation of 42 U.S.C. §122112(b)(5)(A) by failing to fulfill its duty to engage in the interactive process, which resulted in its failure to provide reasonable accommodations.

53. Because of Raytheon's violations of the ADA, Bernard has suffered and will continue to suffer loss of income, benefits, and compensatory damages. Bernard is also entitled to attorney's fees and costs incurred in connection with the claims asserted herein.

54. Raytheon committed the violations of the ADA with reckless disregard or deliberate disregard for Bernard's federally protected rights. Bernard is therefore entitled to an award of punitive damages.

### Second Cause of Action
### Disabilities Discrimination – Disparate Treatment

55. At all times relevant to this case, Bernard was a qualified individual with one or more disabilities.

56. At all relevant times, Bernard had the requisite skill, experience, education, and other job-related requirements of her position, and she was able to safely perform all essential functions of the position, with or without reasonable accommodations.

57. Raytheon discriminated against Bernard in ways that adversely affected the terms and conditions of her employment.  When Rohler became aware of Bernard's disabilities, she subjected Bernard to increased scrutiny and questioned Bernard's managers about her abilities, which caused one or more of her managers to question Bernard directly.  Soon afterwards, Raytheon took away all of Bernard's duties and prevented her from working for over seven months, and then told her that her position had been eliminated.  About three months after that, on September 12, 2023, Raytheon told her she was being laid off from the position that, according to Raytheon, no longer existed.

58. Raytheon took these actions because of Plaintiff's disabilities, in violation of 42 U.S.C. § 12112.

59. Raytheon's violations of the ADA have caused Plaintiff to suffer loss of income, benefits, and compensatory damages.  Bernard is also entitled to attorney's fees and costs incurred in connection with the claims asserted herein.

60. Raytheon committed the violations of the ADA with reckless disregard or deliberate disregard for Bernard's federally protected rights.  Bernard is therefore entitled to an award of punitive damages.

### Third Cause of Action
### Retaliation

61. Bernard engaged in protected activity starting in July or August 2022 when she opposed the disability discrimination that began after Katie Rohler learned of her disabilities, and

continuing thereafter.  Bernard later formally complained of disabilities discrimination and retaliation by filing a Charge and an Amended Charge of Discrimination.

62. After Bernard's opposition to discrimination began, Raytheon retaliated against her by ignoring her complaints and failing to intervene to prevent disabilities discrimination.  For example, Rachel Biederman told Bernard that she should just accept and tolerate Rohler's intrusive and demeaning efforts to hover and monitor Bernard while she worked, and Rohler's baseless questioning of other employees whether Bernard had the required software knowledge and skills.  Many of Raytheon's subsequent actions were the kinds of employment actions that would dissuade a reasonable person from making or supporting a charge of discrimination, such as removing her from her software duties and assigning her to a job in hardware that did not align with her qualifications and career path, failing to pay her salary, failing to adequately engage in the interactive process by refusing to disclose information about the hardware position she was reassigned to, provide reasonable accommodations, falsely claiming there was no more software work for her to do on the Palinode program, and terminating her employment.

63. Raytheon's action violated the anti-retaliation provisions of the ADA, 42 U.S. Code § 12203.

64. Raytheon's unlawful retaliation damaged Bernard by causing her to suffer loss of income and benefits, suffering, mental anguish, inconvenience, loss of personal status and dignity, loss of enjoyment of life, and other damages. Plaintiff is also entitled to attorneys' fees, expert witness fees, and costs incurred in connection with these claims.

65. Raytheon's unlawful retaliatory acts were committed with malice or reckless indifference to Plaintiff's federally protected rights.  Bernard is therefore entitled to, and hereby seeks, punitive damages.

**Equitable and Injunctive Relief**

66. Defendant intentionally engaged in the unlawful employment practices described in this Complaint. Plaintiff therefore asks this Court to enjoin Raytheon from engaging in such unlawful employment practices, and to order affirmative relief, such as reinstatement of Bernard to her former position or a substantially equivalent position, with back pay and full restoration of all seniority and benefits of employment, plus such other equitable relief as this Court deems appropriate.

**Attorney Fees, Expert Witness Fees, and Costs**

67. Plaintiff requests an award of reasonable attorney fees, expert witness fees, and costs of court.

**Jury Demand**

68. Plaintiff demands a trial by jury on all claims asserted in this Complaint for which a trial by jury is allowed by law.

**Prayer for Relief**

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

a. Judgment awarding Plaintiff all compensable damages, including all economic losses, lost past and future income and benefits of employment, and compensatory damages such as suffering, mental anguish, inconvenience, loss of personal status and dignity, and loss of enjoyment of life;

b. Judgment enjoining Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages described in this Complaint;

  c. Judgment awarding all costs of court, expert witness fees, and attorney fees recoverable by law;

  d. Judgment awarding punitive damages;

  e. Judgment awarding such other relief under Title VII to which Plaintiff is entitled by law;

  f. Judgment awarding all pre-judgment and post-judgment interest to which Plaintiff is entitled by law

  g. Judgment awarding all other and further relief to which Plaintiff is entitled.

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff